T.C. Memo. 2006-270


UNITED STATES TAX COURT


ESTATE OF GEORGINA T. GIMBEL, DECEASED,
JANET G. ROGERS, JOANNE M. GIMBEL, AND THOMAS W. GIMBEL,
CO-EXECUTORS AND CO-TRUSTEES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21250-04.                Filed December 19, 2006.


<u>Charles P. Rettig</u>, <u>Edward M. Robbins, Jr.</u>, <u>Cory Stigile</u>, and
<u>Lewis R. Walton, Jr.</u>, for petitioners.

<u>Donna F. Herbert</u> and <u>Michael Zarefsky</u> for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a $5,248,840 deficiency
in the Federal estate tax of the estate of decedent Georgina T.
Gimbel.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of decedent's death.

The only issue for decision is the fair market value of 3,601,267 restricted shares of the common stock of Reliance Steel and Aluminum Company, a publicly traded New York Stock Exchange company (Reliance).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Background

Decedent was predeceased by her husband, William Gimbel (William), who died on December 9, 1998. Decedent died on June 5, 2000 (the valuation date), while residing in California.

From the time of her death, decedent's three children, Thomas W. Gimbel (Thomas), Janet G. Rogers, and Joanne M. Gimbel, have served as coexecutors and cotrustees of decedent's estate, and each has resided in California.

Reliance was founded in 1939 by William's uncle, Thomas Neilan (Mr. Neilan). In 1947, Reliance hired William as an employee. In the late 1950s, Mr. Neilan died, and upon his death William received from Mr. Neilan's estate a 4-percent common stock interest in Reliance, and William became Reliance's chief executive officer.

William's employment with Reliance continued until his death in 1998 by which point William was serving as chairman of Reliance's board of directors.  Throughout his long business career with Reliance, William acquired additional privately held, unregistered shares of Reliance common stock.

Shortly before William's death in 1998, William and decedent established the Gimbel Family Trust (the Trust), and William transferred to the Trust, among other assets, all of his shares of Reliance common stock.

Upon William's death, the Trust was divided into two subtrusts:  A marital trust and decedent's survivor trust (collectively, "the Trusts").

Includable in decedent's gross estate (the estate) were the shares of Reliance common stock (the estate's Reliance shares) held by the Trusts, by decedent's account in Reliance's employee stock ownership plan (ESOP), by decedent's IRA, and by decedent individually, as follows:

| Holder of Estate's Reliance Shares | Number of Shares |
|---|---|
| Marital Trust | 1,874,225[*] |
| Survivor Trust | 1,674,225[*] |
| Reliance ESOP | 25,161[**] |
| Decedent's IRA | 22,500[**] |
| Decedent Individually | 5,156[**] |
| Total | 3,601,267 |

[*] Unregistered shares

[**] Registered shares

As indicated, of the estate's total 3,601,267 Reliance shares, approximately 3,548,450 shares (the shares held in trust) were unregistered shares. The remaining 52,817 Reliance shares includable in decedent's estate held by the ESOP, by the IRA, and by decedent individually were registered shares.[1] On the valuation date, the estate's 3,601,267 shares of Reliance common stock represented approximately 13 percent of the total 27,786,030 shares of Reliance common stock outstanding.

---

[1] Trial testimony indicates that a small number of the Trusts' 3,548,450 Reliance shares may have been registered. The evidence also leaves open the possibility that some of the 52,817 Reliance shares held by the ESOP, by the IRA, and by decedent individually may have been unregistered shares. We accept the parties' treatment of the Trusts' 3,548,450 shares as unregistered and the remaining 52,817 shares as registered.

History of Reliance

Originally, Reliance's business consisted of the fabrication of steel-reinforcing bar. Beginning in the 1950s and continuing over the next few decades, Reliance expanded its operations, acquired several companies in the metals industry, and eventually became a "metal service center".

As of the valuation date, Reliance had a network of 23 divisions and 12 subsidiaries, 72 processing and distribution facilities in 21 States and France, approximately 4,000 employees, and Reliance had become the fifth largest metals service center company in the United States.

As a metal service center, Reliance acquires and processes to customer specifications various types of raw metals and metal products. Reliance distributes more than 75,000 metal products to approximately 65,000 customers in a broad range of industries, including general manufacturing, construction, transportation, aerospace, and semiconductor fabrication.

In September of 1994 Reliance conducted its initial public stock offering (IPO). Between its 1994 IPO and the June 5, 2000, valuation date, Reliance completed 18 company acquisitions and 2 strategic asset purchases.

Shortly after William's death, decedent's son, Thomas, was named a director of Reliance.

Reliance's 1997, 1998, 1999, and 2000 Financial Condition

The chart below summarizes in millions aspects of Reliance's financial statements for 1997, 1998, 1999, and 2000, reflecting Reliance's growth in the years prior to and including the June 5, 2000, valuation date:[2]

|                | 1997  | 1998    | 1999    | 2000    |
|----------------|-------|---------|---------|---------|
| Total Assets   | $584  | $  841  | $  900  | $  997  |
| Net Sales      | 962   | 1,353   | 1,511   | 1,727   |
| Net Income*    | 82    | 117     | 145     | 157     |

*   Net income before depreciation, interest, and income taxes.

The significant annual increases in assets, net sales, and net income reported on Reliance's financial statements were largely attributable to increases in Reliance's gross profit margins and to the addition of assets, net sales, and net income relating to acquired companies.

As of the valuation date, Reliance was negotiating confidentially for the acquisition of another company.  This potential acquisition purportedly would have represented the largest acquisition in Reliance's history and likely would have

---

[2] All financial statement information provided is based on Reliance's public Securities and Exchange Commission (SEC) filings for 1997, 1998, 1999, and 2000.  As of the end of the second quarter of 2000, which was 25 days after the June 5, 2000, valuation date, Reliance held $991 million of assets.  For the first two quarters of 2000, Reliance reported $872 million in net sales and $80 million in net income (before depreciation, interest, and income taxes).

required the use of most of Reliance's available cash and then remaining balance in Reliance's $200 million outstanding line of credit.

Shortly before the valuation date, Reliance's board of directors increased Reliance's per share quarterly dividends from 5 to 5.5 cents.

On the valuation date, Reliance shares reached a public trading price high of $21.25, a low of $20.375, and averaged $20.8125 per share (the valuation date trading price).

On the valuation date, 18,300 shares of Reliance stock were publicly traded.  In the 10 weeks preceding the valuation date, average daily trading volume in publicly traded Reliance shares was approximately 25,000 shares.

Based on the $20.8125 valuation date trading price for publicly traded Reliance shares, multiplied by the total 27,786,030 shares of Reliance common stock outstanding, as of the valuation date Reliance had an equity market capitalization of approximately $578 million.

As of the valuation date, an active market for options and other hedging instruments and derivatives relating to Reliance stock did not exist.

Restricted Nature of Decedent's Reliance Stock

In addition to the fact that almost all of the estate's Reliance shares were unregistered, due to the large number of

decedent's Reliance shares (the shares attributed to her as trustee and beneficiary of the Trusts and the shares she owned through her ESOP and IRA and individually), decedent was considered an "affiliate" (or an affiliated person) of Reliance. Under applicable Federal security laws, because of decedent's status as an affiliate, as of the valuation date, the public resale of the estate's 3,601,267 Reliance shares generally would be restricted.[3]

Under Securities and Exchange Commission Rule 144, 17 C.F.R. section 230.144 (1999) (SEC Rule 144), the estate would not be allowed to sell to the public more than 277,860 of its 3,601,267 restricted Reliance shares in any 3-month period.[4]  Thus, selling the estate's 3,601,267 Reliance shares in the public market under the SEC Rule 144 sales restriction would take a minimum of approximately 3 years and 3 months (i.e., 39 months).

---

[3] Both the parties and the experts treat under applicable Securities and Exchange Commission regulations decedent as an affiliate and the estate's 3,601,267 Reliance shares as restricted.  Further, because 3,548,450 of the estate's 3,601,267 Reliance shares (approximately 99 percent) were unregistered (the shares held by the Trusts), the parties and the experts treat the 3,548,450 shares as restricted regardless of decedent's affiliate status.  We accept this treatment of the estate's Reliance shares.

[4] SEC Rule 144 limits the amount of a corporation's restricted stock that can be sold to the public by a holder of the restricted stock in any 3-month period to the greater of 1 percent of the outstanding class of stock to be sold or the average weekly trading volume for the previous 4 weeks.  In the case of Reliance stock, the greater number would be 1 percent of the outstanding stock, or 277,860 shares.

Also, in order to sell shares under SEC Rule 144, an affiliate must first hold the restricted shares for 1 year. As of the valuation date, the 1-year SEC Rule 144 holding period applicable to the estate's Reliance shares had been satisfied, and the Reliance shares could immediately be sold to the public, subject to the SEC Rule 144 quarterly sales restriction.

In a private placement or under SEC Rule 144A, 17 C.F.R. 230.144A (1992) (SEC Rule 144A), the estate's 3,601,267 Reliance shares could be sold to certain types of investors immediately without the SEC Rule 144 sales restriction. However, any of the estate's Reliance shares that would be sold in a private placement or under SEC Rule 144A would still be restricted, and a purchaser of the estate's Reliance shares would be subject to the same public resale restrictions as the estate.

Consequently, due to liquidity requirements, institutional investors most likely would not have been willing to purchase the estate's Reliance shares.

Reliance Stock Repurchase Plan

On December 15, 1994, the Reliance board of directors adopted a formal stock repurchase plan which allowed for the repurchase by Reliance of up to 2.25 million shares of Reliance stock. On August 31, 1998, the Reliance board of directors increased to 6 million the number of Reliance shares that

Reliance was authorized to repurchase under the stock repurchase plan.

From December 1994 through the valuation date, under Reliance's stock repurchase plan Reliance repurchased in the public market approximately 1.37 million shares (2.7 million after adjustment for a stock split) of Reliance stock for approximately $27 million. The largest repurchase of Reliance stock that occurred during this period, both in number of shares and dollar amount, occurred during an 11-day period in October of 1998 when Reliance for $11,090,017 repurchased on the open market 430,800 Reliance shares (646,200 shares after adjustment for a stock split).

On May 25, 2000, about 2 weeks before the June 5, 2000, valuation date, Dave Hannah (Hannah), Reliance's CEO, made a presentation at a steel industry conference. In his presentation, Hannah reported that 1999 represented a "record year" for Reliance and that Reliance would consider repurchasing Reliance shares at around $19 a share, as it had done in the recent past.

**October 30, 2000, Repurchase by Reliance of 2,270,000 of the Estate's Reliance Shares**

Prior to her death, decedent had not discussed with Reliance management the possibility that Reliance, upon decedent's death, might repurchase decedent's Reliance shares.

Shortly after decedent's death, representatives of the estate inquired of Reliance's management whether they were aware of any investors who might be interested in purchasing some of the estate's Reliance shares. Reliance's management, on behalf of the estate, asked Reliance's investment banking firm (DLJ) to try to identify private institutional or strategic investors who might be willing to purchase a significant block of the estate's Reliance shares. DLJ made some inquiries in this regard but was not able to identify an interested investor for the estate's Reliance shares. At that point, members of the Reliance board of directors began discussing the possibility of Reliance repurchasing some of the estate's Reliance shares.

Hannah approached the estate's attorney and told him that Reliance's management may be willing to approve Reliance's repurchase of some of the estate's Reliance shares. Hannah explained to the estate's attorney that Reliance's management would have to evaluate any repurchase in light of the pending company acquisition, the possible need and ability to obtain additional financing, and the impact of a leveraged repurchase on Reliance's financial ratios.

Eventually, at an October 18, 2000, meeting, Reliance's board of directors (with Thomas excused) approved the repurchase of up to $50 million worth of the estate's Reliance shares at $19.35 per share. The record is not clear as to how Reliance's

directors established the $19.35 per share repurchase price, but trial testimony indicates that management took into account advice from DLJ to the effect that the Reliance stock repurchase price should reflect a 10 to 15 percent discount from the trading price of the stock.

At the same meeting, in order to fund the authorized $50 million repurchase of Reliance stock from the estate, the Reliance directors authorized, pending bank approval, increasing Reliance's existing credit line by $50 million -- from $200 million to $250 million.

On October 30, 2000, after receiving the $50 million increase to its credit line, Reliance privately repurchased 2.27 million shares of the estate's Reliance stock at $19.35 per share, for a total price of $43,924,500. The 2.27 million shares repurchased by Reliance represent 63 percent of the estate's 3,601,267 Reliance shares.

Federal Estate Tax Return, Audit, and Valuation Reports

On September 5, 2001, the estate's Federal estate tax return was timely filed.

In connection with the preparation of the above estate tax return, the estate's attorney retained Gregory Range (Range) to value the estate's Reliance shares. In his report dated November 13, 2000, Range concluded that the value at which the estate's Reliance shares should be included in decedent's gross

estate was the $20.8125 valuation date trading price for publicly
traded Reliance shares discounted by 20.72 percent to reflect
lack of marketability and liquidity relating to the resale
restrictions applicable to the estate's Reliance shares and to
the size of the block of the estate's Reliance shares in relation
to the volume of publicly traded shares of Reliance stock.[5]

On audit, respondent determined that the estate's Reliance
shares should be discounted from the valuation date trading price
but by only 8 percent.  The notice of deficiency and the record
herein do not reflect how respondent calculated this
8-percent discount.

For trial, both the estate and respondent retained new
valuation experts.  On December 18, 2005, Ken Nunes (Nunes),
respondent's new valuation expert, finalized a report in which he
concluded that the estate's Reliance shares should be included in
decedent's gross estate at the valuation date trading price
discounted by 9 percent.

---

[5] Gregory Range (Range) discounted the estate's Reliance
shares by 20 percent from the $20.625 valuation date closing
trading price instead of from the $20.8125 valuation date average
trading price as required in sec. 20.2031-2(b)(1), Estate Tax
Regs.  In a letter to the estate's attorney attached to his
valuation report, Range states:  "If the IRS wants to express the
fair market value in terms of the discount from the mean of the
high and the low prices as of the valuation date, then the
discount would be 20.72%."  For convenience and uniformity with
the other experts, we use for Range's discount 20.72 percent.

On December 22, 2005, Curtis Kimball (Kimball), the estate's new valuation expert, finalized a report in which he concluded that the estate's Reliance shares should be included in decedent's gross estate at the valuation date trading price discounted by 17 percent.

The schedule below sets forth the percentage discount from the valuation date trading price, the discounted per share value, and the total value of the estate's Reliance shares as reported on the estate's Federal estate tax return, as asserted by the estate at trial, as determined in respondent's notice of deficiency, and as asserted by respondent at trial:

|  | Discount From Trading Price | Discounted Per Share Value | Discounted Total Value of Estate's Reliance Shares |
| --- | --- | --- | --- |
| Estate Tax Return (Range) | 20.7% | $16.50 | $59,420,918 |
| Petitioner's Expert (Kimball) | 17.0% | 17.27 | 62,209,637 |
| Respondent's Notice of Deficiency | 8.0% | 19.15 | 68,964,263 |
| Respondent's Trial Expert (Nunes) | 9.0% | 18.94 | 68,207,998 |

OPINION

Generally, under section 2031(a) the value of a decedent's gross estate is based on the fair market value of property owned by the decedent as of the date of death.

For Federal estate tax purposes, the term "fair market value" is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and individual characteristics of the hypothetical persons or entities are not necessarily the same as the characteristics of the eventual actual seller or actual buyer. Estate of Simplot v. Commissioner, 249 F.3d 1191, 1195 (9th Cir. 2001), revg. 112 T.C. 130 (1999); Estate of Mellinger v. Commissioner, 112 T.C. 26, 33 (1999).

For shares of publicly traded stock, the average of the highest and lowest quoted selling prices on the valuation date generally establishes the value of the shares. Section 20.2031-2(b)(1), Estate Tax Regs. However, if a taxpayer establishes that the quoted selling prices do not reflect the fair market value of the shares, then some reasonable modification of the selling price and other relevant facts and elements of value may be considered in determining the fair market value. Estate of Gilford v. Commissioner, 88 T.C. 38, 48 (1987); sec. 20.2031-2(e), Estate Tax Regs. For example, sale restrictions on shares

of stock may affect the valuation of the shares.  Shackleford v. United States, 262 F.3d 1028, 1032 (9th Cir. 2001); Bayley v. Commissioner, 624 F.2d 884, 885 (9th Cir. 1980), affg. 69 T.C. 234 (1977).

Property included in an estate is valued as of the date of the decedent's death, and subsequent post-death events relating to the property being valued generally are to be disregarded. Ithaca Trust Co. v. United States, 279 U.S. 151, 155 (1929); Succession of McCord v. Commissioner, 461 F.3d 614, 626 (5th Cir. 2006), revg. 120 T.C. 358 (2003).

However, subsequent events which are reasonably foreseeable as of the valuation date may be considered because they would be foreseeable by a willing buyer and a willing seller, and they therefore would affect the valuation of the property as of the date of death.  Saltzman v. Commissioner, 131 F.3d 87, 93 (2d Cir. 1997), revg. T.C. Memo. 1994-641; Trust Servs. of Am., Inc. v. United States, 885 F.2d 561, 569 (9th Cir. 1989); Morris v. Commissioner, 761 F.2d 1195, 1201 (6th Cir. 1985), affg. T.C. Memo. 1982-508; Estate of Gilford v. Commissioner, supra at 54.

One expert may be persuasive on a particular element of valuation, and another expert may be persuasive on another element.  See Parker v. Commissioner, 86 T.C. 547, 562 (1986). Consequently, a court may adopt some and reject other portions of

expert reports.  See Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938).

## Comparison of Experts' Appraisal

In this case, the experts focused primarily on four general valuation methods to estimate the fair market value of the estate's 3,601,267 Reliance shares:  (1) A secondary public offering of the estate's Reliance shares, (2) a private placement with a third party or a sale under SEC Rule 144A (hereafter private placement), (3) a Reliance repurchase, and (4) open market public sales subject to the SEC Rule 144 sales restriction (dribble out).

## Secondary Public Offering and Private Placement

Kimball and Nunes testified that for business reasons Reliance probably would not have approved a secondary public offering in which the estate's Reliance shares would be sold. Range also acknowledged that a secondary public offering might be unrealistic.

We agree with the experts that as of the valuation date Reliance probably would not have approved a secondary public offering of the estate's Reliance shares.  Among other things, in order to conduct a secondary public offering of the estate's Reliance shares, Reliance would have been required, in violation of a confidentiality agreement, to disclose to the public the

pending company acquisition which was being negotiated as of the valuation date.

Regarding the viability of a private placement, the evidence indicates that, other than a repurchase by Reliance, as of the valuation date a private market for the estate's Reliance shares did not exist. Hannah testified, and the experts generally agreed, that as of the valuation date there existed no strategic investors for Reliance stock. The estate's inability, despite the attempt of its representatives, to locate a strategic investor for the estate's Reliance shares corroborates our finding that as of the valuation date strategic investors for the estate's Reliance shares did not exist.

Even if a strategic investor for Reliance shares did exist, the estate's Reliance block represented a minority interest that likely would not have been marketable to a strategic investor because of industry trends towards acquisition of entire companies.

Further, due to the resale restrictions on the estate's Reliance shares, which would have been also applicable to a purchaser of the estate's restricted Reliance shares, an institutional investor, because of the need to maintain liquidity in its investments, likely would not have been interested in purchasing the estate's Reliance shares.

We conclude that as of the valuation date a disposition of the estate's Reliance shares through either a secondary public offering or a private placement was not likely.

Reliance Repurchase

In his report, Range does not discuss the foreseeability of Reliance repurchasing the estate's Reliance shares.

Kimball concludes that as of the valuation date it was not reasonably foreseeable that Reliance would repurchase any of the estate's Reliance shares, and he therefore does not factor a repurchase of the estate's Reliance shares into his valuation. Kimball does note that if Reliance were to repurchase the estate's Reliance shares, the shares would be discounted in the same manner as if they had been sold in a private placement.

Nunes concludes that as of the valuation date it was reasonably foreseeable that Reliance would repurchase 50 percent of the estate's Reliance shares and that the discount on the sales price for the repurchase would be 13.9 percent. Nunes does not indicate specifically how he concludes that it was reasonably foreseeable that 50 percent of the estate's Reliance shares would be repurchased.

Nunes arrives at his 13.9-percent repurchase discount in a two-step process. Nunes first calculates a 12.5-percent repurchase discount based on the following: (1) For the actual October 2000 repurchase of a significant portion of the estate's

Reliance shares DLJ apparently suggested to Reliance management a discount range of 10 to 15 percent; (2) Hannah told Nunes, and also testified, that if on the valuation date the estate had asked Reliance to repurchase some of the estate's Reliance shares, and if Reliance at that time was interested in repurchasing the shares, Reliance management would have sought and relied on DLJ's advice; and (3) Reliance's financial and business position did not appear materially to change between the June 2000 valuation date and the actual October 2000 repurchase date. Based on the foregoing, Nunes assumes that on the June 5, 2000, valuation date DLJ would have suggested to Reliance the same 10- to 15-percent discount range DLJ suggested in October of 2000. Nunes then chooses the 12.5-percent midpoint of the above range for his repurchase price discount from the valuation date trading price.

Nunes' second step in his valuation of the 50 percent of the estate's Reliance shares that he treats as repurchased by Reliance involves discounting the estimated sales proceeds that would be realized on the repurchase to account for holding costs and the time value of money during the estimated 3-month period after the valuation date to complete the repurchase. Nunes calculates that the discount adjustment relating to this 3-month period increased the repurchase discount from 12.5 percent to 13.9 percent.

We agree that as of the valuation date a repurchase by Reliance was reasonably foreseeable. Reliance's repurchase plan had been in place for several years. Reliance had a track record for repurchasing a significant number of shares. Hannah, 10 days prior to the valuation date, had stated publicly that Reliance would favorably consider repurchasing Reliance shares at approximately $19 a share, although Hannah did not indicate how many shares Reliance might be willing to repurchase. We disagree, however, that it was reasonably foreseeable that Reliance would repurchase 50 percent of the estate's Reliance shares.

As of the valuation date, Reliance was negotiating a large company acquisition which, if successful, would have required significant cash and credit. Considering that the potential acquisition would have stretched Reliance's financial capacity, we do not believe it reasonably foreseeable, as of the valuation date, that Reliance would repurchase 50 percent of the estate's Reliance shares.

Of significance also is the fact that the largest prior Reliance repurchase was the October 1998 series of stock repurchases totaling 646,200 shares for $11,090,017. The repurchase of 50 percent of the estate's Reliance shares would have cost Reliance approximately three times as much as the October 1998 repurchases.

After evaluating the history of Reliance's repurchases and the valuation date financial and business conditions of Reliance, and understanding that valuation is inherently imprecise, we conclude that, as of the valuation date, it was reasonably foreseeable that Reliance would be financially able and willing to repurchase 20 percent, or 720,253, of the estate's 3,601,267 Reliance shares.

Though we find some flaws and imprecision in both steps of Nunes' discount methodology, neither of the estate's experts provided a distinct methodology for estimating a repurchase discount. We conclude that in this case the 13.9-percent repurchase discount used by Nunes is appropriate to utilize in the valuation of the 20 percent of the estate's Reliance shares that we conclude it was foreseeable would have been repurchased by Reliance.

## Dribble-Out Method for the 2,881,014 Balance of Reliance Shares

We conclude that the 2,881,014 balance of the estate's Reliance shares should be valued under the dribble-out method.

The experts agree that, at the SEC Rule 144 rate of 277,860 shares per 3-month period, it would take 3.25 years (the dribble-out period) to liquidate the estate's 3,601,267 Reliance shares. The experts, however, use different methodologies for discounting the future sales proceeds to reflect the time value of money and the risk that Reliance's stock price might decrease during the

dribble-out period.  Below we analyze the experts' methods for valuing the estate's Reliance shares under the dribble-out method.

(1) Range Report

By multiplying the estate's Reliance shares by the $20.625 valuation date closing trading price (see supra note 5), Range calculates the dribble-out sales proceeds for the estate's Reliance shares to be $73,186,781.[6]  Using a risk-free rate of return, Range then discounts the $73,186,781 sales proceeds to a $65,764,163 present value as of the June 5, 2000, valuation date.

Range further concludes that a hypothetical investor dribbling out the estate's Reliance shares would purchase put options to enable the Reliance shares to be sold at the valuation date price throughout the dribble-out period.  Range calculates a $10,494,345 cost for put options that would allow the Reliance shares to be sold for $20.625 a share throughout the entire dribble-out period.  Range then subtracts from his $65,764,163 present value for the estate's dribbled out Reliance shares his $10,494,345 estimated cost for the put options, resulting in a net dribble-out discounted value of $55,269,818, reflecting a

---

[6] Range's report considers only the 3,548,450 Reliance shares held in trust.  On the estate's estate tax return, however, the estate applies to all of the estate's 3,601,267 Reliance shares the same discount that Range applies to the Trusts' 3,548,450 shares.

24.5-percent overall discount from the valuation date trading value.

(2) <u>Kimball Report</u>

By multiplying the estate's 3,601,267 Reliance shares by the $20.8125 valuation date trading price, Kimball calculates the dribble-out sales proceeds of the estate's Reliance shares to be $74,951,369.  To the $74,951,369, Kimball adds the $1,083,656 in estimated dividends to be paid on the estate's Reliance shares during the dribble-out period, resulting in $76,035,025.[7]

Kimball then discounts the $76,035,025 to present value using a discount factor equal to a 13.2-percent expected rate of return on Reliance equity.  Applying the 13.2-percent discount to $76,035,025, Kimball calculates a $61,910,012 valuation date present value for the estate's Reliance shares, reflecting a 17.4-percent overall discount from the valuation date trading price.

(3) <u>Nunes Report</u>

Under the dribble-out method, Nunes values only 1,800,364 shares (50 percent of the estate's 3,601,267 Reliance shares remaining after the hypothetical repurchase of 50 percent of the

---

[7] Instead of including in his calculation of future value estimated future dividends that would be paid with respect to the estate's Reliance shares during the dribble-out period, Range includes estimated Reliance dividends in the pricing of the put option contracts.

estate's Reliance shares).  Nunes calculates $37,475,695 in gross sales proceeds on the estate's 1,800,364 dribble-out shares (1,800,634 shares times $20.8125).  In calculating a discount under the dribble-out method, Nunes concludes that, in order to protect against the risk that the price of Reliance stock might decrease during the extended dribble-out period, a hypothetical investor would enter into hedging contracts such as "cashless collars" or "prepaid variable forward contracts," which hedging contracts Nunes estimates would cost $1,885,005.  From the $37,475,685 estimated sales proceeds for the estate's 1,800,364 Reliance shares to be dribbled out, Nunes subtracts the $1,885,005 estimated cost for the hedging contracts, resulting in $35,590,680 in net sales proceeds to be realized on the estate's 1,800,364 dribble-out Reliance shares, reflecting a 5-percent discount from the valuation date trading value.

Nunes' 13.9-percent discount applied to the 1,800,363 repurchased shares and the 5-percent discount applied to the 1,800,364 dribble-out shares reflect a combined 9.5-percent overall discount from the valuation date trading value for all of the estate's 3,601,267 Reliance shares.

After reviewing the experts' reports and the evidence at trial, we conclude that the hedging contracts used by Range and Nunes likely would not have been available for a block of stock such as the estate's Reliance shares.

With respect to the put options used by Range in his dribble-out analysis, we believe the testimony of Kimball that an active market did not exist for put options on the estate's Reliance shares.  In order for the estate to purchase put options on its Reliance shares, the estate would have to find a party willing to write nonstandard, nontraded put options.  Even if a writer of put options on Reliance stock could be found, the writer would require a substantial premium due to the inability to unwind its position by purchasing opposite call options in the open market and due to other associated market risks.

With respect to the hedging contracts used by Nunes in his dribble-out analysis, we believe the testimony of both Range and Kimball that a market for such hedging contracts relating to the estate's Reliance shares did not exist.  Cashless collars and prepaid variable forward contracts generally are used with blocks of stock that are highly liquid and marketable.  Due to the size of the estate's block of Reliance shares in relation to the outstanding Reliance shares and the SEC Rule 144 restrictions, the estate's Reliance shares lacked liquidity and marketability.

Because we do not agree with either Range's or Nunes' use of hedging contracts and because Kimball's approach appears to be a reasonable and generally accepted method, we adopt Kimball's dribble-out methodology.

Due to our holding that as of the valuation date 20 percent (or 720,253 shares) of the estate's 3,601,267 Reliance shares likely would be repurchased by Reliance and therefore should be valued under that method, the dribble-out period for the estate's 2,881,014 remaining Reliance shares (80 percent of the estate's 3,601,267 Reliance shares remaining after the Reliance repurchase) would be shortened from approximately 39 months to 31 months, to account for fewer (namely 2,881,014) Reliance shares to be dribbled out.

Under Kimball's methodology, in calculating the estimated gross value of the dribble-out shares we multiply the 2,881,014 shares to be dribbled out by the $20.8125 valuation date trading price ($59,961,104) and add the estimated dividends that would be paid on the estate's Reliance shares during the dribble-out period ($744,031) resulting in a total gross value of $60,705,135.  Using Kimball's 13.2 percent discount rate, the $60,705,135 gross value would have a $51,414,274 discounted value as of the valuation date, reflecting a 14.4-percent discount from the valuation date trading value.

As set forth in the schedule below, our total fair market valuation of the estate's 3,601,267 Reliance shares is $64,320,892, reflecting a 14.2-percent overall discount from the $74,951,370 valuation date trading value:

Court's Fair Market Valuation of
Estate's 3,601,267 Reliance Shares

| Valuation Method | Number of Shares | Valuation Date Trading Value of Shares | Discount | Discounted Valuation Date Value |
|---|---|---|---|---|
| Repurchase | 720,253 | $14,990,266 | 13.9% | $12,906,618 |
| Dribble Out | 2,881,014 | 59,961,104 | 14.4% | 51,414,274 |
| Total | 3,601,267 | $74,951,370 | 14.2% | $64,320,892 |

To reflect the foregoing,

Decision will be entered
under Rule 155.